**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CARLOS M. R.,** | **Civil Action No.  20-6016 (MCA)** |
| **Petitioner,** | |
| **v.** | **MEMORANDUM OPINION** |
| **THOMAS DECKER, et al.,** | |
| **Respondents.** | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioner Carlos M.R. ("Petitioner"), a native and citizen of Honduras, who is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and detained at Bergen County Jail ("Bergen County Jail" or the "Facility") in New Jersey.  On May 13, 2020, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.  ECF No. 1.  The matter was originally filed in the United States District Court for the Southern District of New York and was transferred to this District on May 18, 2020.  ECF No. 7.  Pursuant to Standing Order 2020-10, the Clerk of the Court severed the multi-petitioner habeas petition, *see* ECF No. 8, and Petitioner's case was assigned to the undersigned on May 19, 2020.  On May 21, 2020, Petitioner filed an Amended Petition and TRO application seeking his immediate release from detention based on his medical conditions that render him vulnerable to severe illness or death if he were to contract the novel coronavirus disease 2019 ("COVID-19").  *See* ECF Nos. 12, 13.  Respondents oppose the Motion.  *See* ECF No. 16.  Having reviewed the parties' submissions, examined the applicable law, the Court now grants the Petition

insofar as it seeks a Preliminary Injunction requiring Petitioner's release, and orders Respondents to immediately release Petitioner subject to conditions set forth in the accompanying Order.

## I.    FACTUAL BACKGROUND

### a.  Petitioner's Immigration History

Petitioner, a native and citizen of Honduras, entered the United States without inspection at or near San Ysidro, California on February 24, 2019.  *See* ECF No. 16-6, IJ Bond Decision at 002.[1]  That same day, ICE served Petitioner with a notice to appear charging him with removability under section 212(a)(6)(A)(i) of the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1181(a)(6)(A)(i).  *See id.*  Following service of the Notice to Appear, Petitioner remained in ICE custody pursuant to 8 U.S.C. § 1226(a).  *See id.*

Petitioner thereafter moved for release on bond, and, on June 5, 2019, the immigration judge conducted a bond hearing, and which the immigration judge denied Petitioner's request, finding that, although Petitioner had established that he did not pose a danger to the community, he did not meet his burden of showing that he did not pose a risk of flight.  *See id.* at 3-4.

In particular, the immigration judge noted that Petitioner had not identified any family members in the United States, had not submitted a fixed address outside his current residence (an immigration detention facility), had not established an employment history in the United States, and would be placed in a New York shelter if he had no place to go.  *See id.* at 3. The immigration court also stated that, while Petitioner submitted a statement from an individual who was "willing to receive" him, the record did not contain enough independent information pertaining to that

---

[1] Petitioner states that he fled to the United States in February 2019 because he was afraid he would be killed as he had been threatened by gang members, who also killed and threatened members of his family.  ECF No. 13-3, Petitioner's Decl. at ¶ 1.  Petitioner further reports that people in Honduras believe he is gay, and he knows that gay people are killed in his country and was afraid he would be killed too.  *Id.*

individual's financial resources, immigration status, or ability to provide Petitioner with a stable living environment.  *See id.* at 4.

Petitioner appealed, and on March 16, 2020, the Board of Immigration Appeals (the "BIA"), upheld the immigration court's bond determination. *See* ECF No. 16-7, BIA Decision at 803-807.

While his appeal to the BIA was pending, Petitioner applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  On August 16, 2019, the immigration court conducted a hearing on Petitioner's applications, at which Petitioner and another witness testified. *See* ECF No. 16-8, IJ Merits Decision at 1-2. After considering all of the testimony and evidence, the immigration court denied all of Petitioner's applications, finding that he failed to meet his burden of establishing eligibility for asylum withholding of removal, protection under CAT, or voluntary departure, and ordered him removed to Honduras.  *See id.* at 20.  Petitioner appealed this decision to the BIA, and his appeal remains pending.

### b.  The COVID-19 Health Crisis

On March 11, 2020, the World Health Organization ("WHO") classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[2]  Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[3]  As of July 21, 2020, that number has risen to over 3.8 million and the virus has taken 140,904 lives nationally.[4]  New Jersey alone has reported a total of

---

[2] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[4] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jul. 21, 2020).

178,937 cases and 15,715 deaths as of July 21, 2020.[5]   Bergen, where Petitioner is detained, has

had 20,302 cases and 2033 deaths as of July 21, 2020.[6]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19

spreads "mainly from person-to-person" between those "who are in close contact with one another

(within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their

mouths, noses, or eyes.[7]   Common symptoms of COVID-19 include fever, cough, and shortness

of breath.[8]

Experts still have much to learn about how the virus spreads.   In early April, the CDC

director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated

that "a significant number of individuals that are infected actually remain asymptomatic.   That

may be as many as 25 percent[,]" and this is important because asymptomatic individuals

contribute to the transmission of the virus.[9]   The CDC currently estimates that 40% infections are

asymptomatic, and the chance of transmission from people with no symptoms is 75 percent.[10]

Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before

---

[5] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES,
https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jul. 21, 2020).

[6] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jul. 21, 2020).

[7] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[8] Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[9] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[10] Ctrs. for Disease Control and Prevention, COVID-19 Pandemic Planning Scenarios, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited Jul. 13, 2020).

they show symptoms.[11]  These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[12]

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[13] As explained by the CDC, "[s]ome people are more likely than others to become severely ill, which means that they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[14]  Among them are persons who are those over the age of 65 and people of any age with certain underlying health conditions such as serious heart conditions, diabetes, chronic kidney disease, chronic obstructive pulmonary disease, obesity, and moderate to severe asthma ("CDC Risk Factors").[15]  The CDC now advises that certain populations may also be at higher risk of contracting COVID-19 or developing severe symptoms, including those in long-term care facilities, those with disabilities or behavioral disorders, members of racial or ethnic minority groups, pregnant women, and those who are homeless.[16]

---

[11] *See supra* note 9.

[12] *Id.* The CDC also states in its guidance that "COVID-19 may be spread by people who are not showing symptoms." Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[13] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[14] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Jul. 19, 2020).

[15] On June 25, 2020, the CDC updated its guidance to include additional medical risk factors, reflecting available data as of May 29, 2020.  Revisions were made again on July 17, 2020 to reflect recent data supporting increased risk of severe COVID-19 among individuals with cancer. Ctrs. For Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Jul. 19, 2020).

[16] Ctrs. for Disease Control and Prevention, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Jul. 19, 2020).

There is presently no vaccine to prevent COVID-19 infections.[17]  The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing a cloth face covering to curtail the spread of the virus.[18]  Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[19]

But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings.  In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."  *See* ECF No. 16-1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2.  Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult, and the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection. *Id.*

### c.  Petitioner's Medical Conditions

Petitioner has provided the expert opinion of Dr. Sunny Kung, M.D., who has reviewed Petitioner's medical records from Bergen County Jail from September 30, 2019 to May 20, 2020. *See* ECF No. 19-2, Supplemental Letter of Dr. Kung dated May 30, 2020.  According to Dr. Kung, Petitioner's recent blood pressure measurements taken at Bergen County Jail meet the criteria for

---

[17] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited Jul. 19, 2020).

[18] Ctrs. for Disease Control and Prevention, *supra* note 12.

[19] *Id.*

Stage 1 Hypertension based on the most recent guidelines issued by the American Heart Association and American College of Cardiology, and he qualifies for non-pharmacologic intervention (Class I indication), which includes counseling on lifestyle changes such as weight loss, exercise, and healthy eating.[20] *Id.* Dr. Kung notes that Petitioner's medical records do not indicate that such counseling has taken place and opines that counseling and appropriate follow-up with a clinician is imperative to prevent Petitioner's hypertension from progressing to Stage II, which would require pharmacologic intervention. *Id.* Dr. Kung further opines that Petitioner is at higher risk of severe disease if he were to contract COVID-19 due to Stage I Hypertension, as well as his poor oral health, which increase his risk of pneumonia, his ethnicity as a Hispanic male, which is a CDC risk factor for contracting COVID-19, and the delays in care associated with incarceration. *See* ECF No. 13-2, Letter of Dr. Kung dated May 4, 2020.

In addition, Petitioner also reports that he was badly injured in a motorcycle accident in Honduras, in which gang members had been chasing him; he ended up crashing his motorbike and was hospitalized. Petitioner's Decl. ¶ 9. Since that time, he has suffered from migraines, which have worsened during the lockdown. *Id.* He is experiencing up to two migraines a day due to the noise from detainee protests about conditions in the jail. *Id.* Dr. Kung opines that that Petitioner likely has Post Traumatic Stress Disorder ("PTSD") arising from the motorcycle accident, as well as the death threats and risk of violence from gangs. *See* Letter of Dr. Kung. Petitioner's medical expert further opines that his migraines and complex mental health issues are exacerbated by his living conditions at the jail, including  and are not being adequately

---

[20] In his Supplemental Declaration dated May 29, 2020, Petitioner reports that medical staff, without explanation, began checking his blood pressure in the past few weeks but then stopped monitoring his blood pressure. *See* Petitioner's Supp. Decl. ¶¶ 1-2. No medical staff at Bergen County Jail has ever informed Petitioner that he has high blood pressure and have always told him his blood pressure is fine, but a nurse recently asked Petitioner if he has ever taken medication for high blood pressure. *Id.* ¶¶ 3-4.

addressed in detention.  *See id.*  Dr. Kung urges that Petitioner be released immediately for his health and safety.  *See id.*

### d.  COVID-19 Response at the Bergen County Jail

The measures to address COVID-19 at the Bergen County Jail are described in detail in the June 30, 2020 Declaration of Warden Ahrendt ("Ahrendt Decl."), s*ee* ECF, and include procedures for mitigating the risk of COVID-19 exposure from both external and internal sources.

To mitigate the risk of exposure from external sources, the Facility suspended all ICE detainee intakes on or about March 13, 2020; as of June 10, 2020, however, the Bergen County Jail began accepting new ICE detainees, but the detainees are tested for COVID-19 upon arrival at the Facility and are housed with other new arrivals in the medical unit until their test results are returned.  *See* Ahrendt Decl. ¶ 9.A.  If the results are negative, the detainee is reassigned to other housing units depending on their classification.  *Id.*  When someone tests positive for COVID-19, that individual shall be housed in a quarantine unit, and if a positive detainee came in as part of a group, the entire group shall be quarantined for 14 days, regardless of their test result.  *Id.*  The Facility is also screening new county inmates, staff members, and vendors for the coronavirus, *id.* ¶¶ 9.B., 9.D, and has also suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys.  *Id.*¶ 9.C.

Detainees are housed separately from inmates, and the cells in the housing units are approximately 10' x 7', with two beds per cell that are organized in a bunk-bed style.  *Id.* ¶¶ 5-6.  There are no more than two detainees per cell.  *Id.* ¶ 6.  All detainees must remain in their cells at all times, "except for a thirty-minute period each day when they are permitted to exit the cell area."  *Id.* ¶ 9.F.  During the 30-minute period, "six inmates/detainees are permitted to leave

the cell area" where they have "2643 square feet of space" for recreational use and showering. *Id.* Detainees and inmates have meals inside their cells to avoid congregating. *Id.* ¶ 9.L.

The protocol requires that "[a]ll housing units are sanitized no less than four times per day."[21]  *Id.*  In addition, "[t]he Facility provides disinfectant spray, hand sanitizer, and soap in every housing unit," *id.*, but it is not clear whether these supplies are provided directly to detainees. *Id.* In addition, "[i]nmates and detainees have been issued surgical masks, and all inmates and detainees wear their issued masks any time that they are out of their cells." *Id.* ¶ 9.N. Similarly, staff at the facility have been provided with masks to wear in the facility. *Id.* ¶ 9.E.

The Facility also has isolation and quarantine protocols for confirmed and suspected cases of COVID-19. Confirmed cases that do not require hospitalization are isolated in a designated area. *Id.* ¶ 9.H. Symptomatic inmates or detainees who are awaiting test results are quarantined. *Id.* Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period. *Id.* ¶ 9.J. Cohorting ends if no new COVID-19 case develops within that period. *Id.*

The Facility has an on-site physician who is on-call 24/7 for emergencies and has added additional medical staff. *Id.* ¶ 7. Detainees and inmates are permitted to make daily sick calls to on-site medical staff. *Id.* ¶ 9.H. The protocol states that medical staff should evaluate detainees or inmates who complain of illness. *Id.* Those who present with COVID-19 symptoms are provided a "surgical mask." *See id.* Detainees and inmates may be transported to a hospital for evaluation at the direction of the medical director. *See id.* Warden Ahrendt does not state whether

---

[21] The Office of the Bergen County Sheriff also bought three electric and one gas- powered fogger to increase disinfectant capacity throughout the agency, and these foggers are being used to sanitize units in the jail and patrol vehicles after each shift. *Id.* ¶ 9.O.

high-risk detainees like Petitioner are subject to those same procedures, or whether the Facility makes other accommodations based on their needs.

As of June 30, 2020, two ICE detainees and one Bergen County inmate at the Facility have tested positive for COVID-19. *Id.* ¶ 9.P.  There are no ICE detainees and one inmate suspected cases of COVID-19 in the Facility who are on medical observation per CDC guidelines. *See id.* Twenty-seven County Corrections Police Officers and five Nurses who work at the Facility have tested positive for COVID-19.  *Id.*  Twenty-five County Corrections Police Officers and five Nurses have returned to duty, and the remaining officers and nurse are in isolation and are not working at the Facility currently.  *Id.*

### e.  Petitioner's Experiences at Bergen County Jail

Petitioner reports that when detainees were moved from the dorms to cells for the lockdown, staff did not explain the reason for the move or warn them about the virus. Petitioner's Decl. ¶ 16.  Petitioner shares a cell with another person.  *Id.* ¶ 4.  The "cell is very small" and contains a bunk bed, small table, sink and toilet; because Petitioner is scared to sleep on the top bunk, he moves his mattress to the floor, leaving very little space left in the cell.  *Id.* Petitioner reports that it is difficult to stay in his cell for long periods of time, and he is anxious and unable to sleep.  *Id.* ¶ 6.  The worst thing about sharing the cell is that there is no privacy or space when using the toilet.  *Id.*  ¶ 8.  According to Petitioner, the water from the sink in his cell "is dirty and smells" and sometimes makes him feel nauseated.  *Id.* ¶ 7.

Petitioner reports that he and other detainees are currently permitted out of their cells for up to three hours a day, Petitioner's Decl. ¶ 3,  but he never knows what time he will be allowed out of his cell.  *Id.* ¶ 5.  Prior to the pandemic, he was able to work in the kitchen, play sports, and exercise, but he is now unable to do these things.  *Id.* ¶ 3.  Petitioner reports that the food is

also very bad, and he has been gaining weight due to the unhealthy food and lack of exercise.  *Id.* ¶ 8.

Petitioner states that there are currently about eight to ten detainees permitted out of their cells at once.  *Id.* ¶ 10.  This is the only time detainees are able to shower, heat up food in the microwave, make phone calls, and move around in the common space.  *Id.*  According to Petitioner, everyone shares the same showers, phones, and microwave and "[n]o one cleans these items in between."  *Id.*  Detainees help one another by passing things under the doors, like books, soap, medical slips, or food, and Petitioner reports that no one at the jail makes sure detainees stay apart or explains that detainees should stay 6 feet away from other people, or should wash their hands and not touch their faces.  *Id.*  In his Supplemental Declaration dated May 29, 2020, Petitioner reports that similar conditions exist in his new housing unit.  Supp. Decl. ¶ 5.

Petitioner is fearful because the officers and nurses go home to their families and come back every day and could bring the virus back to the jail.  *Id.* ¶ 12.  Although Petitioner was "finally given a mask", he had to wear the same mask for several weeks and it became dirty, and he was not able to clean it.  *Id.*  Petitioner reports that he does not have gloves or a sufficient amount of soap and that detainees sometimes run out of toilet paper, leading detainees to pass toilet paper under the door.  *Id.*  Criminal inmates bring the detainees their food and push it under the door. *Id.*

Petitioner also reports that there were some detainees in his unit who got sick and were taken away.  *Id.* ¶ 13.  These detainees were rumored to have had COVID-19, and Petitioner and other detainees had all been sharing the same space and touching the same things before this happened.  *Id.*  Petitioner also worries he will get sick and be unable to get medical care because it can take weeks to be seen by medical staff after submitting a medical request slip.  *Id.* ¶ 14.

Petitioner recently had a bad migraine and could not see a doctor because the jail had run out of medical request forms. *Id.* Petitioner further reports that doctors don't come around the cells during the day to check on detainees, and no one checks detainees temperatures unless that person has asked to see a doctor or nurse. *Id.* Petitioner states that he feels depressed about his living conditions during the lockdown. *See id.* ¶ 15.

## II.   <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek Section 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). This Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his continued detention violates the Due Process Clause of the Fifth Amendment.

Here, Petitioner has filed a motion for a TRO seeking his immediate release from detention, which the Court construes as a request for a preliminary injunction. *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020). Motions for temporary and preliminary injunctive relief are governed by a four-factor test. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. *Id.* at 179.

The Court also considers whether Petitioner has established extraordinary circumstances justifying his release.  *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

## III.   DISCUSSION

### a.   Threshold Jurisdictional Arguments

Respondents first argue that the Court lacks subject matter jurisdiction to consider Petitioner's claims under § 2241 because Petitioner's claims relate to his conditions of confinement, which are typically brought in a civil rights suit.  Respondents further argue that, even if the Court does have habeas jurisdiction, release is not the proper remedy; instead, the remedy should be a change in the allegedly unconstitutional conditions.  Opp. Brief at 18-21.

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 at 490.  Petitioner asserts that his conditions of confinement at Bergen County Jail violate the substantive Due Process Clause of the Fifth Amendment and amount to unlawful punishment that threatens his health and life, and he seeks immediate release from immigration detention.

Typically, challenges to conditions of confinement by state and federal prisoners or detainees are brought in federal court pursuant to 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  *See, e.g., Camacho Lopez v. Lowe*, No. 20-0563, 2020 WL

1689874, at *4–6 (M.D. Pa. Apr. 7, 2020).  Where an individual seeks "immediate or more speedy release," from detention, however, he or she is asserting a remedy that is only available through a habeas petition.  *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973); *see also Camacho Lopez*, 2020 WL 1689874, at *4 ("[Petitioner] seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life.  This is unequivocally a habeas remedy.").  A habeas petition is the vehicle through which an individual may challenge the "fact or length" of confinement.[22]  *See Preiser*, 411 U.S. at 494.  Although Petitioner brings a claim traditionally asserted through a civil rights complaint, he seeks immediate release from ICE custody, which is a remedy that is only available through a habeas petition.  *See, e.g., Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002); *Camacho Lopez*, 2020 WL 1689874, at *4 (citing *Preiser*, 411 U.S. at 500) ("When a petitioner seeks immediate release from custody, the 'sole federal remedy' lies in habeas corpus"); *Marvin A.G. v. Decker*, 2020 WL 3481746, at *2 (D.N.J., 2020) (same).

Neither the Third Circuit nor Supreme Court has definitively addressed whether civil detainees may bring conditions of confinement claims in a habeas corpus petition.  *See Camacho Lopez*, 2020 WL 1689874, at *5.  The Supreme Court has repeatedly left open the question of whether detainees may challenge their confinement conditions via a petition for a writ of habeas corpus.  *See Bell v. Wolfish*, 441 U.S. 520, 526, n.6, (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of

---

[22] In *Preiser*, the Supreme Court addressed the scope of relief state prisoners may seek under the federal civil rights statute, 42 U.S.C. § 1983, and held that when a challenge falls within the "heart of habeas corpus," *id.* at 498, state prisoners may not proceed by way of a section 1983 action, as otherwise they could evade the exhaustion and other procedural requirements established for state habeas challenges in the federal courts. *Id.* at 489–90. Claims that fall within the "heart" or "core" of habeas corpus, and thus may be brought in federal court solely by means of a petition for the writ, are those in which a prisoner "challeng[es] the very fact or duration of his physical imprisonment." *Id.* at 500. The Court, however, did not hold that the converse is also true—that is, that any claim challenging something apart from the fact or duration of confinement may <u>not</u> be raised in habeas. *See Aamer v. Obama* 742 F.3d, 1023, 1031–32 (D.C.C. 2014) (explaining same).

confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."); *Ziglar v. Abbasi*, ––– U.S. ––––, 137 S.Ct. 1843, 1862-63 (2017) (explaining that the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief for immigration detainees challenging a detention policy than a suit for money damages, as a successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately).  Similarly, the Third Circuit has alluded to a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action only in extreme cases." *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978).[23]

Likewise, recent COVID-19 decisions within this Circuit have rejected the government's arguments that habeas should not be extended to such claims.[24]  *See Alirio R.R. v. Correia*, No 20-6217, 2020 WL 3249109, at *9 (D.N.J. Jun. 15, 2020) (rejecting respondents' argument that the Court lacked subject matter jurisdiction over petitioner's claims under § 2241); *Jose M. C. v. Tsoukaris*, No. 20-6236, 2020 WL 3249097, at *5 (D.N.J. Jun. 16, 2020) (same).

---

[23] In § 2241 petitions brought by convicted federal inmates, the Third Circuit distinguishes between those petitions that implicate the execution of the federal inmate's sentence, *see Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005) (holding that federal inmate's challenge to BOP regulation limiting his placement in community confinement goes to the execution of his sentence and thus can be brought via § 2241); *McGee v. Martinez*, 627 F. 3d 933, 934 (3d Cir. 2010) (challenge to Inmate Financial Responsibility Plan ("IFRP") is a means to execute a sentence and cognizable under § 2241), and those challenges that strictly implicate conditions of confinement, which are properly brought as *Bivens* actions.  *See Cardona v. Bledsoe*, 681 F. 3d 533, 534 (3d Cir. 2012) (action challenging the BOP's decision to place him in the Special Management Unit ("SMU") does not implicate the execution of inmate's sentence and thus properly brought as a *Bivens* action).  The Court is not persuaded that this line of cases is dispositive here, as Petitioner is not a convicted prisoner serving a federal sentence, and, thus this distinction appears inapplicable to civil detainees.

[24] Two weeks ago, in *German Santos v. Warden Pike County Correctional Facility*, __ F.3d __, 2020 WL 3722955, at *6 (3d Cir. Jul. 7, 2020), the Third Circuit held that whether an immigration detainee's "conditions of confinement are 'meaningfully different[ ]' from criminal punishment[]' is a factor in determining whether his or her detention has become unreasonably prolonged" under 8 U.S.C. § 1226(c) (quoting and reaffirming the constitutional holding of *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) and explaining that "if an alien's civil detention under § 1226(c) looks penal, that tilts the scales toward finding the detention unreasonable").  Thus, at the very least, the Third Circuit permits consideration of detainee's conditions of confinement in analyzing whether habeas relief is warranted.

These courts also determined that, in light of the extraordinary circumstances posed by the global pandemic, release via temporary restraining orders or preliminary injunctions was the proper remedy for immigration detainees whose conditions of confinement were found to be unduly punitive in light of their underlying medical conditions. *See Jose M.C.*, 2020 WL 3249097, at *5 (collecting cases).  This Court likewise finds that Petitioner may pursue his due process claims through the instant petition for writ of habeas corpus and may seek a preliminary injunction directing his release under reasonable conditions as a remedy.

### b.  Substantive Claims for Relief

Petitioner asserts that continuing to detain him at Bergen County Jail poses a serious threat to his health and safety because he has serious medical conditions that make him vulnerable to complications or death should he contract COVID-19.  As to the merits of Petitioner's constitutional claims, the Government argues that he cannot meet the TRO or preliminary injunction standards because he is lawfully detained under § 1226(a)[25] and because Bergen County Jail has taken sufficient precautions against COVID-19 and has met Petitioner's medical needs. Opposition Brief at 22-44.

Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees.  *See, e.g., Cristian A.R. v. Decker*, No. 20-3600, 2020 WL 2092616, at *9-10 (D.N.J. Apr. 12, 2020); *Rafael L.O.*, No. 20-3481, 2020 WL 1808843, at * 6-7 (D.N.J. Apr. 9, 2020).  Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as

---

[25] The Court need not reach Petitioner's arguments that his bond hearing violated due process or the Administrative Procedures Act ("APA") because it finds that he has established a likelihood of success on his claim that his detention amounts to punishment. The Court notes, however, that the Third Circuit's published decision in *Borbot v. Warden Hudson County Correctional Facility*, 906 F.3d 274 (3d Cir. 2018), appears to foreclose Petitioner's arguments regarding the adequacy of his bond hearing under §1226(a).

opposed to the Eighth Amendment.  *See Bell*, 441 U.S. at 535-36; *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).   The Fifth and Fourteenth Amendments protect civil detainees like Petitioner from all—*not just "cruel and unusual"*—punishment.   *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'"  *Sharkey*, 928 F.3d at 307 (quoting *Hubbard*, 538 F.3d at 232). A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).  The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment.  *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted).  Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from exposure to serious contagious diseases.  *See Cristian A.R.*, 2020 WL 2092616, at *9 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

This Court has previously released medically vulnerable petitioners at Bergen County Jail. *See, e.g., Cristian A.R.,* 2020 WL 2092616, at *9-10 (finding that the protocols in place at Bergen and Hudson County Jails did not adequately protect medically vulnerable detainees and holding that continued detention such detainees during COVID-19 pandemic amounted to punishment under the Fifth Amendment); *Asmed B. v. Decker*, No. 20-3734, 2020 WL 2539351 (D.N.J. May

17

19, 2020) (finding that continued detention of medically vulnerable detainee at Bergen County Jail amounted to punishment and ordering detainee released); *Anthony O. v. Decker*, No. 20-3856, 2020 WL 2571897, at *1 (D.N.J. May 20, 2020) (same); *Renat T. v. Decker*, No. 20-4658, 2020 WL 3819227, at (D.N.J. Jul. 8, 2020) (same).

Petitioner here, like the Petitioners in *Cristian A.R.*, *Asmed B.*, *Anthony O.*, and *Renat T.*, has provided sufficient evidence that he has serious underlying medical conditions that render him more vulnerable to complications or even death if he were to contract COVID-19, and the existing protocols at Bergen County Jail, which are largely unmodified from those the Court considered in those cases, are insufficient to protect Petitioner from contracting COVID-19 and therefore amount to punishment under the Fifth Amendment.

Given the heightened risk of COVID-19 exposure, the CDC Guidelines have made clear that correctional facilities must make "all possible accommodations" to prevent transmission of infection to high-risk individuals.  CDC Interim Guidance at 16, 20.  But despite the laudable, general protocols implemented generally at Bergen County Jail, Warden Ahrendt does not point to any specific protocols to protect medically-vulnerable people in the Facility's custody.  Nor do Respondents contest the lack of available testing, and Warden Ahrendt's Declaration does not indicate that the Facility has sufficient testing supplies.  Additionally, he confirms that they are not testing asymptomatic individuals (other than new detainees), even though those individuals can transmit the virus.  *See* Ahrendt Decl. ¶¶ 9.H. & 9.J.  And, while he concedes to cohorting those who have had a known exposure to the virus, he does not indicate whether high-risk individuals like Petitioner would be ensured separation or adequate space from others in the cohorting environment.  Although Respondents emphasize that there have been only two confirmed positive cases of COVID-19 at Bergen County Jail and few suspected positive cases among inmates and

detainees, its stance on testing prevents the Court from determining whether the dearth of new positive cases is due to the sheer lack of testing or successful containment measures. Thus, to the extent Respondents have taken measures to address the pandemic within Bergen County Jail, they have not ensured protection for the most vulnerable people within their care.

As noted above, Warden Ahrendt's June 30, 2020 Declaration also states that detainees have now been provided a surgical mask to wear when outside their cells and clarifies that cleaning supplies have been made available to detainees to sanitize shared spaces and items; he further reports that there are no shortages in cleaning supplies at the Facility. *See* Ahrendt Decl. at ¶¶ 9.N; 9.L. These improvements to the protocols, while laudable, together with assurances about the availability of cleaning supplies do not change the Court's determination that the Facility does not sufficiently protect the most medically vulnerable detainees in their care.

In that regard, Petitioner reports that he shares a cramped cell with another detainee, that shared items and surfaces in the common area are not sanitized between uses, and that detainees do not have sufficient supplies and are not able to social distance in the cells or common areas. He further reports that when he finally received a mask, he was required to wear the same mask for several weeks and was not able to clean the mask when it became dirty.[26]

Because Petitioner's conditions of confinement are not meaningfully distinguishable from the petitioners' circumstances in *Cristian A.R.*, *Asmed B., Anthony O.*, or *Renat T.*, the Court finds that Petitioner has shown a likelihood of success on the merits of his claim that his detention amounts to punishment in light of his particular vulnerabilities.[27]

---

[26] During the pendency of this action, the Facility changed its protocol and began providing a mask to each detainee to wear outside his/her cell.

[27] Civil detainees also have a constitutional right to adequate medical care, including the creation of policies ensuring adequate health care, and such claims are governed by the deliberate indifference standard. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted

19

For the same reasons, the Court finds that Petitioner is "more likely than not" to suffer irreparable harm absent the requested relief, *see Reilly*, 858 F.3d at 179, and Petitioner need not wait until his health or life are impaired to seek relief.  As the Supreme Court observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

That brings the Court to the balancing of the equities and the public interest. "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co*., 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted).  In *Cristian A.R*., the Court found the potential of injury to petitioners to be high and also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL 1808843, at *9). The same is true here, albeit to a lesser extent, as hospitalizations in New Jersey have declined in the three months since the Court issued its decision in *Cristian A.R.*[28]

---

deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm).  Because the Court finds that Petitioner is likely to succeed on his claim that his conditions of confinement amount to punishment and because deliberate indifference has a more stringent *mens rea* requirement, it need not reach the deliberate indifference claim.

[28]*See N.J. coronavirus deaths increase to 11,970 with 162,530 total cases. Hospitalizations fall below 2,000 for 1st time in months,* NJ.com (Jun. 4, 2020), https://www.nj.com/coronavirus/2020/06/nj-coronavirus-deaths-increase-to-11970-with-162530-total-cases-hospitalizations-fall-below-2000-for-1st-time-in-months.html.

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public. As Judge Vasquez found in *Rafael L.O.* and this Court recently found in *Cristian A.R.*, those very important interests are adequately addressed here by fashioning appropriate conditions of release. *See Cristian A.R.*, 2020 WL 2092616, at \*13. Here, Petitioner is an asylum-seeker who has never been criminally arrested. He has informed the Court that he will live with his cousin in Colorado if he is released, *see* Petitioner's Decl. ¶ 18, and his immigration counsel and social worker have made plans to assist him with that transition and connect him with legal services. ECF No. 20-1, Declaration of Alexandra Lampert ("Lampert Decl." ¶¶ 3-6. Under these circumstances, the Court finds that Petitioner can be safely released on reasonable conditions of supervision. Although his ties to the United States are not extensive, the Court is satisfied that there are reasonable conditions that can ensure Petitioner's appearance at any future immigration or removal proceedings. The specific conditions of release are set forth in the Order accompanying this Memorandum Opinion.

Finally, the Court also finds that Petitioner, who has provided an expert's opinion that he has several underlying conditions that render him vulnerable to complications or death if he were to contract COVID-19, and is currently detained at Bergen County Jail, where he cannot maintain social distance or adequate hygiene, has established the extraordinary circumstances necessary to warrant the remedy of release on bail, and make bail necessary to make the habeas remedy effective. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at 28 (citing *Landano*, 970 F.2d at 1239).

For these reasons, the Court will grant the Petition to the extent it seeks a preliminary injunction directing Petitioner's immediate release on reasonable conditions. An appropriate Order follows.

Dated:  July 27, 2020

_/s Madeline Cox Arleo_____
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**